UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHELLE SOUCIE,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BRAIDWOOD, ILLINOIS,<br><br>Defendant. | Case No. 17-cv-5235<br><br>Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Michelle Soucie, a former deputy chief police officer, brings this discrimination and retaliation action against her former employer, the City of Braidwood, Illinois, alleging that Defendant illegally suspended her after she complained about sexual harassment. Defendant moves for summary judgment [49]. For the reasons explained below, this Court grants Defendant's motion.

**I.    Background**

The facts in this section come from Defendant's Local Rule 56.1(a)(3) statement of undisputed facts [50] and Plaintiff's statement of additional facts [62].

**A.    The Parties**

Defendant is a municipal corporation in Will County, Illinois. [50] ¶ 3. Plaintiff started working for Defendant's police department in September 1998. *Id.* ¶ 4.

In May 2015, Nicholas Ficarello became chief of police for Defendant's police department. *Id.* ¶ 5. At the time, the deputy chief position was open, and Ficarello

decided to fill the position. *Id.* ¶ 7. After an interview process, Defendant appointed Plaintiff as deputy chief, and she started serving in that role in July 2015. *Id.*

B. **Plaintiff's Suspension**

After Defendant appointed Plaintiff as deputy chief, Ficarello assigned her scheduling duties, payroll duties, and responsibility to investigate citizen and internal complaints. *Id.* ¶ 8. Throughout 2016, Plaintiff's payroll duties required her to prepare and submit payroll documents for her husband, Allen, who served as a sergeant for Defendant's police department up until June 2016. *Id.* ¶ 9.

Defendant says that in September 2016, Ficarello began investigating Plaintiff upon his belief that Plaintiff caused Defendant to pay Allen for work he did not do. *Id.* ¶ 10. According to Defendant, Ficarello asked Plaintiff if Allen had worked the week of June 3 through June 10, and Plaintiff responded "no;" Ficarello then asked Plaintiff if she paid Allen for that week, and she said "yes." *Id.* ¶ 11. Plaintiff, on the other hand, denies that such a conversation took place. [62] ¶¶ 11, 12. As part of his investigation, Ficarello obtained payroll records showing that Defendant paid Allen for 40 hours of "regular time" for the week of May 30 to June 6. [50] ¶ 12.

In October 2016, after Ficarello had begun to investigate Plaintiff, Defendant's police department attempted to complete an undercover operation to capture a drug dealer. *Id.* ¶ 14. Defendant says that on the date of the operation, Allen appeared at the scene and the department consequently terminated the operation for fear that the target would recognize Allen as a former police officer. *Id.* Ficarello subsequently suspected that Plaintiff shared the operation's details with Allen. *Id.* ¶ 15.

2

Following this incident, Ficarello discussed with police commissioner Eric Tessler and Mayor Vehrs his belief that Plaintiff shared confidential information about police operations with Allen. *Id.* ¶ 17. Then, in early November 2016, according to Defendant, Ficarello and Mayor Vehrs met with counsel to discuss terminating Plaintiff and pursuing criminal charges against her. *Id.* ¶ 18.

Prior to a November 22, 2016 city council meeting, Tessler decided to announce that Defendant would begin the process to terminate Plaintiff. *Id.* ¶ 19. And, at the November 22, 2016 city council closed session, Tessler announced the beginning of the process to terminate Plaintiff, stating "the plan is to fire Michelle Soucie." *Id.* ¶ 21. The city council discussed Plaintiff's conduct as "fraud," "ghost payrolling," "theft of city services," and "stealing." *Id.* The city council also discussed its belief that Plaintiff shared information with Allen. *Id.* A few days later, on November 28, 2016, Ficarello wrote to the city's attorney: "I believe the time has come to put her on paid leave . . ." *Id.* ¶ 23.

On January 17, 2017, Ficarello presented Plaintiff with a letter suspending her from work pending an ongoing investigation and attaching the basis of the charges against her. *Id.* ¶ 32. Up until Plaintiff's suspension, Plaintiff continued to process payroll. [62] ¶ 5.

### C. Alleged Harassment

Plaintiff alleges that she experienced inappropriate comments and harassment starting in July 2015, when Defendant appointed her deputy chief, through the date of her suspension in January 2017. [50] ¶ 39.

3

One time, Ficarello told Plaintiff he became partially naked as part of a sting operation, and that he did so to make his ex-girlfriend jealous. *Id.* ¶ 40. Plaintiff also claims that on at least five occasions she heard Ficarello state, "I stopped counting at 58 dancers and strippers," a comment that arose when Plaintiff and Ficarello discussed their past relationships. *Id.* ¶ 41. Plaintiff admits that she used Ficarello as a sounding board, but became uncomfortable when he suggested she leave her husband. *Id.* ¶ 42.

In August 2015, after a golf outing, Plaintiff joined Ficarello at the club bar. *Id.* ¶ 43. After a couple of drinks, Plaintiff tried to convince Ficarello to rehire a former police officer; Ficarello then put his arm around Plaintiff and said "if she rubs his back he will rubs hers." *Id.* Plaintiff did not respond to this comment, but continued to speak to Ficarello about the officer until they left the club bar. *Id.* At a different golf outing in August 2016, while Plaintiff smoked a cigar, Ficarello commented "how he liked how the cigar looked in her mouth." *Id.* ¶ 51.

Ficarello never made any explicit invitations for sex. *Id.* ¶ 44. Plaintiff claims, however, that in August 2015, Ficarello invited her to a barbecue at his house, where he commented that she seemed to loosen up and was a lot more fun when she had a drink. *Id.* ¶ 45. Plaintiff says that on the following Monday, Ficarello told her she left too early, as women started to get topless and dance at the barbecue. *Id.*

In October 2015, in anticipation of attending dinner in Chicago after a conference, Ficarello informed Plaintiff and another woman that they needed to wear

heels. *Id.* ¶ 46. Prior to that dinner, Ficarello whistled and commented that he liked the heels that Plaintiff wore. *Id.* ¶ 47.

On another occasion, Ficarello—wearing a white shirt—asked Plaintiff if she could see his nipples. *Id.* ¶ 48. And on another occasion, Ficarello informed Plaintiff that he had a vasectomy; Plaintiff responded by stating that her husband had also had a vasectomy. *Id.* ¶ 49. Another time, Ficarello referred to his penis as "Little Nick," and Plaintiff laughed in response. *Id.* ¶ 50.

Plaintiff concedes she "wasn't afraid to tell [Ficarello] how I felt." *Id.* ¶ 52. She further testified: "So, if there was something I didn't agree with or something he wanted to do that I didn't agree with, I told him that. . . . I didn't address with him the comments that he made that made me uncomfortable because I felt that I could deal with it." *Id.* And, although Plaintiff claims there were times she "became emotional," she admits that she was never unable to perform her work duties. *Id.* ¶ 54.

According to Plaintiff, Defendant suspended her after, and because, she complained about harassment on December 15, 2016 by delivering a letter to Mayor Vehrs. *Id.* ¶ 62. Plaintiff says Defendant first became aware of the alleged harassment through this letter. *Id.* Mayor Vehrs denies he received such a complaint, in writing or otherwise. *Id.*

### D. The Complaint's Causes of Action

In July 2017, Plaintiff filed suit in this Court. [1]. Counts I and II of her complaint allege sex discrimination and harassment in violation of Title VII and the

5

Illinois Human Rights Act (IHRA), respectively. *Id.* ¶¶ 19–25. Counts III and IV allege unlawful retaliation in violation of Title VII and the IHRA. *Id.* ¶¶ 26–31.

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

**III. Analysis**

**A. Counts III and IV: Retaliation**

To prevail on her retaliation claims, Plaintiff must prove that: (1) she engaged in an activity protected by the statute; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (setting forth the elements of a Title VII retaliation claim); *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that the Title VII framework applies with equal measure to IHRA claims).

For the purposes of this motion, Plaintiff identifies one adverse employment action: she claims that after she delivered the December 2016 letter to Mayor Vehrs complaining about harassment, Defendant suspended her. [1] ¶ 12; *see also* [59] at 5.[1] Neither party disputes that Plaintiff engaged in protected activity by delivering the alleged letter, or that Plaintiff's suspension constitutes an adverse employment action. *See* [51] at 5–10.

This Court's analysis thus focuses upon whether a causal link exists between Plaintiff's letter and her suspension. A plaintiff demonstrates a causal connection by showing that the defendant "would not have taken the adverse . . . action but for [her] protected activity." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting

---

[1] In her complaint, Plaintiff also alleges "other retaliatory actions" Defendant took against her— namely, (1) attempting to interfere with her health insurance; and (2) disclosing to the local newspaper that Plaintiff filed EEOC charges. [1] ¶ 16. Plaintiff, however, does not substantively address these alleged instances of retaliation in her summary judgment response, and therefore concedes that summary judgment should be granted as to those instances. *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011).

7

*Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015)). That causal connection can be established through direct evidence—in the form of an employer's admission—or through circumstantial evidence from which a fact-finder can infer intent. *Id.*; *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). Under either approach, the relevant inquiry on summary judgment remains: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

This Court answers that question in the negative. The record establishes that Defendant had already begun to investigate Plaintiff's behavior and initiated the process to terminate her employment well before she delivered her letter. Specifically, Defendant decided to initiate Plaintiff's termination in the fall of 2016. At the city council meeting on November 22, 2016, Tessler affirmatively announced "the plan is to fire [Plaintiff]," listing Plaintiff's conduct as "fraud," "ghost payrolling," "theft of city services," and "stealing." [50] ¶¶ 18, 19, 21. At that same meeting, the city council also discussed Plaintiff's termination process. *Id.* ¶ 22. Plaintiff did not deliver her alleged letter complaining about harassment until December 2016, about one month *after* this meeting. *Id.* ¶ 62.

Where the record, as here, demonstrates that Defendant contemplated Plaintiff's suspension before Plaintiff engaged in protected activity, and then later proceeds along those same lines, Plaintiff fails to establish causation. *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 811 (7th Cir. 2005). Thus, it remains irrelevant

8

that Plaintiff's actual suspension became effective in January 2017, after she delivered the alleged letter in December 2016; Defendant *had already made the decision* to terminate her in November 2016, before she delivered the alleged letter.

Plaintiff attempts to avoid summary judgment by arguing that Defendant's proffered reasons for suspending her were pretextual. [59] at 6–8. She points to evidence that Defendant left Plaintiff in charge of processing payroll up until her suspension. [62] ¶ 5. Plaintiff also denies ever telling Ficarello about paying Allen for time he did not work. *Id.* ¶¶ 11, 12.

Neither of these grounds creates a triable issue as to causation. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 505 (7th Cir. 2017) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). The relevant question "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Id.* (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012)).

None of the evidence suggests that Defendant did not honestly believe the reasons offered for Plaintiff's suspension. As discussed above, at the November 2016 city council meeting, the city council discussed Plaintiff's conduct as "fraud," "ghost payrolling," "theft of city services," and "stealing." [50] ¶ 21. The record from the city council meeting thus lends credence to Defendant's explanation that they suspended Plaintiff for legitimate, non-discriminatory reasons. Without more, Plaintiff's

9

arguments about Defendant's retaliatory motive boils down to mere speculation that Defendant lied to conceal its true motives; such conjecture remains insufficient to withstand summary judgment. *Agyropoulos*, 539 F.3d at 734, 737.

Based upon this record, no reasonable fact-finder could find that Plaintiff's suspension was motivated by discriminatory motives, as opposed to a legitimate, nondiscriminatory purpose. This Court thus grants summary judgment to Defendant on Counts III and IV of Plaintiff's complaint.

### B. Counts I and II: Sex Discrimination

In Counts I and II, Plaintiff asserts that Defendant is liable for sex discrimination, specifically for creating a hostile work environment. [1] ¶¶ 19–25. Defendant argues that Plaintiff lacks sufficient evidence to succeed on her hostile work environment claims. [51] at 11–14. This Court agrees, as explained below.

#### 1. Legal Framework

The legal standard used to evaluate a discrimination claim "is simply whether the evidence," considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [hostile work environment]." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

To succeed on her hostile work environment claims, Plaintiff must prove that: (1) she was subject to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631,

636 (7th Cir. 2019); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). While sometimes the Seventh Circuit phrases the test differently, looking alternatively for evidence that the plaintiff's workplace was both subjectively and objectively offensive (in place of the first and third prongs set forth in *Gates*), the inquiry remains the same in either case. *Johnson*, 892 F.3d at 900; *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 896 n.6 (7th Cir. 2016).

That inquiry considers all relevant circumstances, *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013), including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). To survive summary judgment, Plaintiff must provide sufficient evidence from which a reasonable fact-finder could conclude that Ficarello's conduct was so "severe or pervasive" that it legally constitutes "a hostile work environment." *Gates*, 916 F.3d at 636 (quoting *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018)).

Defendant does not meaningfully contest the first, second, or fourth prongs of the *Gates* test. Rather, it acknowledges, for summary judgment purposes, that Plaintiff experienced unwanted harassment (prong 1) on account of her sex (prong 2). *See* [67] at 10. Further, as to employer liability (prong 4), where the supervisor is the alleged harasser, the employer is strictly liable for the supervisor's conduct, subject to an affirmative defense that the harassment does not result in a tangible employment action. *See Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013); *Dapkus*

11

*v. Chipotle Mexican Grill, Inc.*, No. 15 C 6395, 2017 WL 36448, at *7 (N.D. Ill. Jan. 4, 2017) ("Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense where the plaintiff suffered no tangible employment action."). Defendant, however, does not raise that affirmative defense here. *See generally* [51] [67].

Plaintiff's hostile work environment claims therefore hinge upon the prong concerning severity and pervasiveness (prong 3).

### 2. Severe or Pervasive

In determining whether conduct is severe and pervasive enough to alter the conditions of employment and create a hostile work environment, courts consider both the actual effect of the conduct on the plaintiff (the subjective test) and what the effect would be on a reasonable person in the plaintiff's position (the objective test). *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 674 (7th Cir. 1993). If the plaintiff "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation." *Harris*, 510 U.S. at 21–22. Likewise, conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. *Id.* at 21.

To satisfy the subjective test, Plaintiff must demonstrate that she actually perceived her work environment as hostile. *Id.* at 21–22. Based upon the record here, Plaintiff cannot meet this burden. For example, in her deposition, Plaintiff admitted

she "wasn't afraid to tell [Ficarello] how [she] felt." [50] ¶ 52. She further stated that "if there was something I didn't agree with or something he wanted to do that I didn't agree with, I told him that. . . . I didn't address with him the comments that he made that made me uncomfortable because I felt that I could deal with it." *Id.* Plaintiff also conceded she was never unable to perform her work duties. *Id.* ¶ 54. Plaintiff's admissions, including the examples noted above, confirm that she did not subjectively perceive her work environment as sufficiently hostile that Ficarello's conduct legally interfered with her work performance.

For this reason alone, Plaintiff's hostile work environment claims fail as a matter of law. *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 882–83 (7th Cir. 2018) (affirming summary judgment because the plaintiff failed to set forth evidence showing that her employer's conduct adversely affected her job performance, given her admission that the "main impediment to her job performance was conflicting directives"); *Walker-Dabner v. Dart*, No. 15-CV-942, 2019 WL 1045087, at *8 (N.D. Ill. Mar. 5, 2019) (granting summary judgment to employer, in part because the record contained no evidence suggesting that the plaintiff was unable to continue working); *Mahran v. Advocate Health & Hosps. Corp.*, No. 17 C 5730, 2019 WL 952131, at *9 (N.D. Ill. Feb. 26, 2019) (granting summary judgment to employer because the plaintiff failed to present evidence that the harassment "interfered with his work.")

The record similarly fails to support a finding of objective offensiveness. When analyzing the objective severity of harassment, drawing "the line is not always easy.

13

On one [actionable] side lie sexual assaults; other physical contact . . . uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other [unactionable] side lies the occasional vulgar banter, tinged with sexual innuendo." *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir. 1995) (citations omitted).

Employers generally do not face liability for "off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear*, 911 F.3d at 881; *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012). Nor are they liable for "occasional vulgar banter, tinged with sexual innuendo." *Swyear*, 911 F.3d at 881 (quoting *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002)). Typically, "it is a combination of severity and frequency that reaches the level of actionable harassment." *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006).

Here, as noted above, Plaintiff complains about nine sexually suggestive comments Ficarello directed at her (one of which Ficarello repeated five times) that occurred between July 2015 and January 2017. [50] ¶¶ 39–51. The nature of Ficarello's comments ranged from telling Plaintiff that he "liked how the cigar looked in her mouth" while she smoked a cigar, to directing Plaintiff to wear heels and then commenting that he liked the heels she wore. *Id.* Ficarello also told Plaintiff he became naked as part of a sting operation; on another occasion, he referred to his penis as "Little Nick" (to which Plaintiff laughed in response). *See id.* Ficarello's conduct, although unquestionably inappropriate and unprofessional, does not rise to

actionable harassment under prevailing Seventh Circuit standards; his comments were sporadic, he never made any aggressive physical contact or explicit invitations for sex, and he was not physically threatening. In short, Ficarello's conduct was "more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005); *see also Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (eight gender-related comments were "too isolated and sporadic to constitute severe or pervasive harassment."); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009) (occasional comments, including that the plaintiff was "made for the back seat of a car" and looked like a "dyke," failed to constitute objectively severe or pervasive conduct); *Baskerville*, 50 F.3d at 431 (overturning a jury verdict on a hostile work environment claim where the plaintiff only presented evidence of a "handful" of offensive comments "spread over months"); *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005) (affirming summary judgment where the evidence presented a handful of comments of a sexual nature, which were neither serious nor threatening).

Arguably the most severe incident occurred when Ficarello put his arm around Plaintiff and told her if "she rubs his back he will rub hers"—the only time Ficarello physically contacted Plaintiff. [50] ¶ 43. But a "hand on the shoulder, a brief hug, or a peck on the cheek" is typically nonactionable. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000); *see also, e.g., Hilt-Dyson*, 282 F.3d at 463–64 (allegations that a supervisor rubbed the plaintiff's back, squeezed her shoulder, and

15

stared at her chest during a uniform inspection were insufficient); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361–62 (7th Cir. 1998) (teasing, ambiguous comments about bananas, rubber bands, and low neck tops; staring; and four isolated incidents of touching the plaintiff's arm, fingers, and buttocks did not constitute actionable sexual harassment).

This Court remains mindful that in a recent opinion, the Seventh Circuit cautioned that courts should view "a supervisor's [conduct] in the workplace as much more serious than a co-worker's." *Gates*, 916 F.3d at 638. There, the Seventh Circuit reversed summary judgment where the plaintiff's supervisor directed racially motivated comments to plaintiff, including uttering the "N-word" and threatening to write up his "black ass"; although the comments were relatively infrequent and not physically threatening or humiliating, the Seventh Circuit concluded that they could not be deemed insufficiently severe or pervasive as a matter of law. *Id.* at 640–41.

Because Ficarello was Plaintiff's supervisor, *Gates* directly controls this Court's rulings here. *Gates*, however, is distinguishable in two key respects. First, though distasteful, Ficarello's comments to Plaintiff were not objectively as severe or offensive as those in *Gates*, which the Seventh Circuit characterized as "appalling racist language." *Id.* at 639; *see also Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the [n-word] can have a highly disturbing impact on the listener.").

Second, the Seventh Circuit in *Gates* observed that the employer's harassment of plaintiff interfered with the plaintiff's work performance, so much so

that it led him to take a leave of absence from work to seek medical treatment. *Gates*, 916 F.3d at 641. Thus, the plaintiff there offered evidence that his workplace was subjectively offensive, in addition to being objectively offensive. *Id.* Here, as discussed above, the record confirms that Plaintiff did not perceive her work conditions as severe and pervasive enough to legally constitute a hostile environment.

For these reasons, this Court finds that Plaintiff's hostile work environment claims fail as a matter of law. As such, this Court grants summary judgment to Defendant on Counts I and II.

## IV. Conclusion

For the reasons explained above, this Court grants Defendant's motion for summary judgment [49]. All dates and deadlines, including the trial date, are stricken. Civil case terminated.

Dated: March 18, 2019

Entered:

_____
John Robert Blakey
United States District Judge